UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JUANITA ARRINGTON, as Independent Administrator of the Estate of RONALD ARRINGTON, deceased, | No. 17 C 05345 |
| Plaintiff, | Judge Thomas M. Durkin |
| v. | |
| CITY OF CHICAGO, an Illinois municipal corporation, et al., | |
| Defendants. | |
| ISIAH STEVENSON and MICHAEL COKES, | No. 17 C 04839 |
| Plaintiffs, | Judge Thomas M. Durkin |
| v. | |
| CITY OF CHICAGO, an Illinois municipal corporation, et al., | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs filed two lawsuits asserting various federal and state law claims in connection with a police pursuit that ended in a vehicle collision. The cases were consolidated for pretrial discovery and are now before the Court on cross-motions for summary judgment and motions to exclude certain expert witness opinions. A summary of the Court's resolution of these motions is set forth at the conclusion of this opinion.

1

**Background**

**I.     Factual History**

The following facts are undisputed except where otherwise indicated. On July 1, 2016, plaintiff-decedent Ronald Arrington left Chicago in a gold Pontiac Grand Prix to pick up plaintiff Isiah Stevenson in Matteson, Illinois. R. 202 ¶ 9.[1] When the car left Chicago, plaintiff Michael Cokes was seated in the rear seat on the passenger side, while non-party Jimmy Malone was seated in the front passenger seat. R. 202 ¶ 10. Once Arrington picked up Stevenson, Cokes moved to the rear driver's side seat while Stevenson sat in the rear passenger side. R. 202 ¶ 11.

After picking up Stevenson, Arrington started to drive back toward the highway to return to Chicago. Malone pointed Arrington to another area, saying he had to take care of some business quickly. R. 224-1 ¶ 8. The car eventually made its way to an Arby's parking lot. *Id.* Once there, Malone got out of the car, leaving the front passenger door open; the other occupants remained in the car. R. 202 ¶ 15. Malone then allegedly robbed a woman in the parking lot before returning to the car and telling Arrington to drive away. R. 202 ¶ 14.

Arrington drove the Pontiac to the highway, at which point he stopped the vehicle on the side of the road and refused to drive any farther. R. 202 ¶¶ 18-19. He moved from the driver's seat to the rear, and Malone then moved into the driver's seat and continued driving on the highway. R. 202 ¶¶ 19-20.

---

[1] Unless otherwise indicated, cited docket numbers correspond to the record in case no. 17-cv-5345.

Illinois State Police ("ISP") Troopers Brian Walker and Charles Dixon later received an emergency broadcast that a gold Pontiac with tinted windows and no registration was being sought in connection with an armed robbery. R. 202 ¶¶ 27. After hearing this broadcast, Walker and Dixon relocated to Interstate 57 north and waited to see if they spotted the Pontiac. R. 202 ¶¶ 28-29. Eventually, Walker saw a vehicle matching the description traveling northbound on I-57, and both troopers began to follow it. R. 202 ¶¶ 30-31. Although the troopers did not activate their lights or initiate a stop, after some time, the Pontiac exited I-57 and stopped on the exit ramp. R. 202 ¶ 32. Walker and Dixon told the occupants to exit the vehicle, but nobody did. R. 202 ¶ 33. About 20 seconds after it stopped, with Malone still at the wheel, the vehicle drove off. R. 202 ¶¶ 34-36. Walker pursued the Pontiac through Calumet Park, Illinois and continued into Chicago. R. 202 ¶¶ 37-38. During the ISP pursuit, Malone violated several traffic laws, including running red lights, crossing lane markers, and driving on road shoulders. R. 202 ¶¶ 42-46.

Meanwhile the same day, defendant Dean Ewing, an officer with the Chicago Police Department ("CPD"), was on patrol in his unmarked Ford Explorer. R. 199-1 ¶ 1. Officers Ortiz, Caulfield, and Barango were passengers in the Ford. *Id.* Ewing heard a CPD radio transmission from another person asking the dispatcher if she was monitoring an outside frequency. R. 199-1 ¶ 5. Ewing then heard the dispatcher state, "OK I am getting westbound from 124th and Wallace … OK wanted for armed robbery … Gold Pontiac …" R. 199-1 ¶ 7. The dispatcher did not state how many people were in the Pontiac or how many suspects were being sought. R. 199-1 ¶ 8.

3

Ewing knew that an outside agency was involved in the pursuit but did not know which one. R. 199-1 ¶ 9.

Ewing turned the Ford onto Halsted Street and proceeded south, intending to drive to the area where the chase was occurring. R. 199-1 ¶ 11. He was not assigned to the pursuit, nor did he inform his supervisor or CPD dispatch that he was driving to the pursuit area. R. 199-1 ¶¶ 15, 17. While driving, he continued to listen to dispatch and altered his course based on callouts of the pursuit location. R. 199-1 ¶ 20.

Eventually, Ewing turned on 124th Street, traveling eastbound. R. 199-1 ¶ 25. At that point, he believed he was driving on a street parallel to the pursuit and in the same direction. R. 199-1 ¶ 28. He drove through a stop sign at Emerald Avenue going 46 mph, above the posted 30 mph speed limit on 124th Street. R. 199-1 ¶¶ 29-30. Officer Ortiz could hear the sirens from the ISP cars, but Ewing did not activate the sirens on his car. R. 199-1 ¶¶ 33, 36. Ewing testified that had he been in pursuit, he would have had his siren on. R. 199-1 ¶ 39. He knew that he was exceeding the speed limit on 124th Street. R. 199-1 ¶ 47.

As he accelerated down 124th Street, the Ford reached 55 mph. R. 199-1 ¶ 38. Ortiz testified that at one point when approaching an intersection, Ewing slowed down because the occupants did not want to collide with the suspect or pursuit vehicles. R. 199-1 ¶ 41. As Ewing approached the 124th Street and Union Avenue intersection, roughly 2.0 seconds before the collision, the throttle on the Ford dropped

to 0%. R. 199-1 ¶ 42. Ewing drove through the stop sign controlling eastbound traffic on 124th Street without stopping or slowing the Ford. R. 199-1 ¶¶ 53-54.

In the seconds leading up to the crash, the gold Pontiac driven by Malone and carrying Plaintiffs was traveling northbound on Union Avenue at around 60 mph. R. 199-1 ¶ 56. Union is a one-way southbound street with a posted speed limit of 30 mph and a stop sign for southbound traffic at the intersection with 124th Street. *Id.*; R. 202 ¶¶ 77, 80. The Pontiac entered Ewing's field of vision 1.0 seconds before impact. R. 199-1 ¶ 48. At that moment, the throttle on the Ford was depressed 52.2%, and its speed was 55 mph. R. 199-1 ¶¶ 49-50. A few tenths of a second before the collision, Ewing applied the brakes. R. 202 ¶ 67. The vehicles collided in the intersection, the front of the Ford hitting the driver's side of the Pontiac. R. 199-1 ¶ 57. Arrington was seated in the driver's side rear passenger seat of the Pontiac; he died due to injuries sustained in the crash. R. 199-1 ¶ 58. Stevenson and Cokes were seated on the passenger side of the Pontiac; both sustained injuries in the crash. R. 199-1 ¶ 59. Malone also died due to his injuries. R. 202 ¶ 84.

Following the collision, Stevenson and Cokes were both arrested and indicted on charges of felony robbery. R. 208 ¶¶ 85-90. Each later pled guilty to misdemeanor theft in connection with the incident. R. 208 ¶¶ 87, 90.

## II.  Expert Witness Opinions

### a.  Adam Hyde (Plaintiffs' Accident Reconstruction Expert)

Adam Hyde conducted a traffic accident reconstruction analysis in which he reviewed the scene of the crash and data collected from the Event Data Recorders ("EDRs") of both the Ford and the Pontiac. The EDR records vehicle operation data

including speed, accelerator and brake pedal depression, and steering input. In his report, Hyde discusses the meaning of the data collected by both vehicle's EDRs. He also discusses the layout of the intersection, including visibility obstructions.

In his initial report, Hyde offers several opinions regarding the crash, including opinions on the length of time the drivers of both vehicles would have had to react to each other (incorporating a concept called "Perception and Response Time" or "PRT") and the estimated stopping distance for the Ford as it approached the 124th and Union intersection. Hyde opines that had Ewing "stopped at the stop sign controlled intersection of 124th Street and South Union Avenue the crash would not have occurred." R. 220-1, at 36. He also opines that Ewing violated the law by failing to stop at this stop sign. R. 220-1, at 36.

Hyde's supplemental declaration includes an opinion that the collision between the Ford and Pontiac was "clearly avoidable" and likely would not have happened had Ewing altered his driving behavior in various ways, such as by slowing or stopping his vehicle at the stop sign controlling the 124th Street and Union Avenue intersection, or by driving within the 30-mph speed limit on 124th Street. R. 220-2, at 3. This declaration also includes an opinion that any attempt by the passengers in the Pontiac to seize control of the vehicle as it traveled on Union Avenue would have been likely to cause an accident accompanied by serious harm to the vehicle occupants, bystanders, or surrounding property. *Id.* Hyde also produced a supplemental report which elaborated on some of these opinions, such as describing

6

particular risks with the various means by which the passengers in the Pontiac might have attempted to take control from Malone, the driver. R. 220-3.

### b. Andrew Scott (Plaintiffs' Police Practices Expert)

Andrew Scott's opinions cover generally accepted police practices and procedures and offer an appraisal of Ewing's actions. Scott opined that the force Ewing used to seize Plaintiffs was unreasonable, that he improperly participated in the ISP's pursuit of the Pontiac, that Ewing's conduct was willful and wanton and undertaken without regard for the general public, and that if Ewing was not engaged in the pursuit (and by extension was not enforcing the law), his driving was negligent. R. 220-4. Scott supports these conclusions with references to CPD policies and state laws governing the operation of a vehicle in emergency pursuits. *Id.* In his supplemental declaration, Scott opines that the collision was "easily avoidable" and would not have occurred if Ewing operated the vehicle in a manner Scott considers consistent with the law and CPD general orders. R. 220-5.

### c. Jeremy Bauer (Defendants' Accident Reconstruction Expert)

Bauer conducted an accident reconstruction analysis based on his review of, among other things, a "Crash Summary" report prepared by the City of Chicago, photographs and maps of the 124th Street and Union Avenue intersection and surrounding area, and data from the vehicle EDRs. He did not visit the scene as part of his analysis.

Bauer opines that while he generally agrees with Hyde's interpretation of the EDR reports from both vehicles, he disagrees with Hyde's conclusions regarding the cause of the collision, opining that Hyde completely failed to account for Malone's

role. Bauer also criticizes certain of Hyde's opinions regarding the approach to the 124th and Union intersection, including Hyde's opinion that Ewing did not attempt to avert the crash but essentially sped into it. Bauer offers his own PRT opinion suggesting that Ewing's driving permitted a shorter stopping distance than Hyde estimated—i.e., that Ewing was driving in such a way that he maintained the ability to stop his car faster than Hyde estimated. Bauer criticizes Scott's opinions on similar reasoning, asserting that Scott fails to account for the role Malone's driving played in causing the crash.

## III. Procedural History

Ewing and the City of Chicago are the only remaining defendants in these cases, all others having been dismissed by order or stipulation. The parties previously filed motions for summary judgment, but briefing on those motions was stayed pending resolution of a dispute over allegedly late-asserted affirmative defenses. The Court denied Plaintiffs' motions to strike but permitted limited additional discovery as a remedy. R. 189. The parties thereafter filed the instant cross-motions for summary judgment, which supersede the prior motions.

Plaintiffs have moved for summary judgment on their federal claims under 42 U.S.C. § 1983 for violation of their Fourth Amendment rights, their claims for willful and wanton negligence under Illinois law, and their claims for civil battery under Illinois law. They have also moved for partial summary judgment on several affirmative defenses. *See* R. 199 (Case no. 17-cv-5345); R. 276 (Case no. 17-cv-4839). Defendants have moved for summary judgment on all claims against them. *See* R. 201 (Case no. 17-cv-5345); R. 278 (Case no. 17-cv-4839).

8

Both sides have also moved to exclude certain opinions proffered by the other's experts in connection with the summary judgment motions. *See* R. 220 (Case no. 17-cv-5345, Defendants' Motion to Bar); R. 230 (Case no. 17-cv-5345, Plaintiffs' Motion to Bar); R. 299 (Case no. 17-cv-4839, Defendants' Motion to Bar); R. 309 (Case no. 17-cv-4839, Plaintiffs' Motion to Bar).

## Analysis

### I.    Expert Motions

"The district court functions as a gatekeeper with respect to testimony proffered under [Federal Rule of Evidence] 702 to ensure that the testimony is sufficiently reliable to qualify for admission." *Mihailovich v. Laatsch*, 359 F.3d 892, 918 (7th Cir. 2004). Courts use a three-step analysis to determine whether expert testimony is admissible. *Myers v. Ill. Cent. R.R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010). The court "must determine whether the witness is qualified; whether the expert's methodology is scientifically reliable; and whether the testimony will 'assist the trier of fact to understand the evidence or to determine a fact in issue.'" *Id.* (quoting *Ervin v. Johnson & Johnson, Inc.*, 492 F.3d 901, 904 (7th Cir. 2007)).

#### a. Defendants' Motion to Exclude Certain Opinions from Adam Hyde

Defendants do not dispute that Hyde is generally qualified to offer expert testimony on accident reconstruction. Instead, they challenge several distinct opinions offered by Hyde as individually inadmissible. Defendants seek to bar testimony on three opinions from Hyde's initial report:

12. If Officer Ewing had stopped at the stop sign controlled intersection of 124th Street and South Union Avenue the crash would not have occurred.

13. The driver of an authorized emergency vehicle, when responding to an emergency call, may proceed past a stop sign, but only after slowing down as may be required and necessary for safe operation. They may also exceed the speed limit so long as they do not endanger life or property. They also must drive with due regard for the safety of all persons (625 ILCS 5/11-205 and 625 ILCS 5/11-907).

14. Based upon my conclusions and findings reached in the report, Officer Ewing was driving an unmarked police vehicle and violated the laws outlined in Opinion Number 13.

R. 220-1, at 37. Defendants also seek to bar Hyde's supplemental opinion that Ewing could have prevented the crash by, for example, slowing or stopping at the stop sign at 124th and Union, or driving within the 30-mph speed limit on 124th Street. R. 220-2, at 3. Finally, Defendants challenge Hyde's supplemental opinion that any attempt by the passengers in the Pontiac to gain control of the vehicle would have likely caused the vehicle to crash with serious risk of bodily harm to its occupants or bystanders. *Id.*

The Court understands Defendants' challenge to Hyde's "causation" opinions to be narrow, as much of Hyde's proffered evidence is relevant and helpful. For example, Hyde's explanation of the vehicles' EDR data and assessment of the crash scene assists the jury in determining how Ewing was driving in the immediate lead-up to the crash, which is relevant to whether the crash was purely accidental or a deliberate effort on his part. While juries likely have some intuitive understanding of concepts like vehicle stopping distance and PRT, even if not by that name, the addition of expert testimony helps to ground them in the facts of this case. Other

10

courts have permitted expert testimony on these topics. *See, e.g.*, *Jones v. Beelman Truck Co.*, 2015 WL 3620651, at *3 (E.D. Mo. June 9, 2015); *Cordova v. Hoisington*, 2014 WL 11842836 (D.N.M. Jan. 20, 2014).

Opinion number 12 and several of Hyde's supplemental opinions assert that Ewing could have avoided the collision by taking alternative action in the moments leading up to it. The Court understands these opinions were prompted at least in part by Defendants' late assertion of an "unavoidable collision" defense, and that Plaintiffs were permitted to supplement their evidence to respond to this theory. R. 228, at 7. However, as explained below, the Court in this order is granting partial summary judgment to Plaintiffs on the "unavoidable collision" issue, likely obviating the need for some of these opinions.

In addition, these opinions largely boil down to a simple observation: that if these cars had not been driving in the manner they were, the accident would not have occurred. The jury does not need expert assistance to reach this conclusion. *See Davis v. Duran*, 277 F.R.D. 362, 366-67 (N.D. Ill. 2011) ("To be helpful, the testimony must concern a matter beyond the understanding of the average person."). In cases involving complicated questions of accident causation—perhaps involving more vehicles or unexpected mechanical behavior—accident reconstruction experts might provide valuable assistance in understanding what really "caused" a crash. But here, the basic circumstances of the crash are more easily understood. The key disputed issues are whether Ewing used excessive force, whether his actions were willful and wanton, and to what extent Plaintiffs themselves bear any responsibility. Hyde's

conclusions that the crash would not have occurred had the vehicles been in different places is obvious and has little bearing on these issues. Accordingly, Defendants' motion to exclude those conclusions is granted. Hyde will nonetheless be permitted to testify regarding Ewing's driving to the extent such testimony is relevant to other contested issues.

Opinion 13 reads less like an opinion than as a baseline assumption underlying opinion 14. Still, to the extent Hyde purports to opine about the content of the law governing the operation of emergency vehicles as a standalone conclusion, this is impermissible. Allowing an expert to testify as to a purely legal matter usurps the judge's role of instructing the jury as to the applicable law. *See Roundy's Inc. v. N.L.R.B.*, 674 F.3d 638, 648 (7th Cir. 2012) (stating that the Federal Rules prohibit experts from offering opinions about determinative legal issues). Similarly, opinion 14 is an improper legal conclusion that abridges the jury's role of applying the law to the facts. *See Davis*, 277 F.R.D. at 371 (excluding expert testimony that police officer lacked lawful basis to use deadly force because it "undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's" (quoting *Nimely v. City of New York*, 414 F.3d 381, 397 (2d Cir. 2005))). Both opinions are therefore inadmissible.

Finally, Defendants argue Hyde's opinion regarding the feasibility of the passengers in the Pontiac wresting control of the vehicle from Malone during the pursuit is unsupported by facts, data, or reliable methodology. Like his causation opinions, much of this opinion seems obvious. Jurors likely do not need any expert

assistance to understand that interfering with the driver of a moving car is highly dangerous. Indeed, courts have acknowledged that doing so invites serious danger. *See Seeger v. Canale*, 607 N.E.2d 687, 690 (Ill. App. Ct. 1993). But more importantly, this portion of Hyde's opinion seems to be a preemptive response to an argument Defendants have not made—while Defendants argue in their summary judgment motions that Plaintiffs were negligent in failing to take reasonable precautions against Malone's dangerous driving, they focus on the early portion of the pursuit, between the robbery in the Arby's parking lot and when the Pontiac stopped on the highway exit ramp. *See* discussion *infra*. At no point in their motion do Defendants suggest Plaintiffs should have overpowered Malone and forcibly swerved the Pontiac into a roadside obstacle as it sped up Union Avenue. As such, the Court finds this portion of Hyde's opinions should be excluded. However, the Court notes that if Defendants elicit any evidence suggesting Plaintiffs should have attempted to seize control of a moving vehicle during the pursuit, it may open the door to rebuttal testimony from Hyde or other witnesses.

### b. Defendants' Motion to Exclude Opinions of Andrew Scott

Defendants challenge the entirety of Scott's proffered testimony on largely the same grounds they challenged Hyde's. The Court agrees with Defendants in part. Scott's ultimate opinions (1) that the force Ewing used to seize Plaintiffs was unreasonable, (2) that Ewing's conduct was willful and wanton, and (3) that Ewing was not engaged in enforcement of the law and was therefore negligent are all determinative legal conclusions and therefore inadmissible. *Davis*, 277 F.R.D. at 371.

However, not all of Scott's testimony is equally excludable. "When an expert offers an opinion relevant to applying a legal standard," testimony "describing sound professional standards and identifying departures from them" may be admitted. *Jimenez v. City of Chicago*, 732 F.3d 710, 721 (7th Cir. 2013); *see also Abdullahi v. City of Madison*, 423 F.3d 763, 772 (7th Cir. 2005) (applying this rule to testimony regarding whether officers deviated from reasonable police practices). Much of Scott's testimony falls within this permissible window, discussing ordinary practices for vehicle pursuits and the ways in which Ewing allegedly violated those practices.

Defendants cite to *Thompson v. City of Chicago*, 472 F.3d 444, 454 (7th Cir. 2006), which held that "the violation of police regulations or even a state law is completely immaterial as to the questions of whether a violation of the federal constitution has been established." But this does not mean the evidence is barred from Plaintiffs' entire case. It remains relevant on Plaintiffs' other claims, including the claim that Ewing's conduct was willful and wanton. *See Hudson v. City of Chicago*, 881 N.E.2d 430, 456-57 (Ill. App. Ct. 2007) ("[A]lthough a violation of an internal rule will not automatically constitute willful and wanton conduct, a jury may consider it along with other evidence in reaching a determination of willful and wanton conduct.").[2] The Court therefore denies Defendants' motion as to this testimony.

---

[2] Note that the jury will also be instructed that a violation of a regulation is not evidence of a constitutional violation. *See* 7th Circuit Pattern Jury Instruction 7.04, Limiting Instruction Concerning Evidence of Statutes, Administrative Rules,

### c. Plaintiffs' Motion to Exclude Certain Opinions from Jeremey Bauer

Plaintiffs first challenge Bauer's qualifications, but this argument must be rejected because Bauer possesses sufficient training and experience to provide his proffered testimony. "The requirement that an expert be qualified by knowledge, skill, experience, education or training should not be viewed as being particularly rigorous." *Traharne v. Wayne/Scott Fetzer Co.*, 156 F. Supp. 2d 697, 706 (N.D. Ill. 2001). Plaintiffs argue that Bauer has limited training or academic experience in accident reconstruction. While Bauer's education appears focused on human biomechanics, he has been a certified accident reconstructionist since 2013 and is a member of the Society of Automotive Engineers and the Washington Association of Technical Accident Investigators. He has previously testified as an expert on accident reconstruction in multiple trials. Even if traffic collisions are not Bauer's specialty, "a lack of specialization generally affects the weight of the opinion, not its admissibility." *Lott v. ITW Food Equip. Grp. LLC*, 2013 WL 3728581, at *14 (N.D. Ill. July 15, 2013). "A witness may qualify as an expert even if the opposing counsel can point to deficiencies in his or her qualifications." *Superior Aluminum Alloys, LLC v. U.S. Fire Ins. Co.*, 2007 WL 1850860, at *5 (N.D. Ind. June 25, 2007) (quoting *Traharne*, 156 F. Supp. 2d at 706). The Court finds Bauer meets the "threshold"

_____

Regulations, and Policies ("You have heard evidence about whether Defendant's conduct complied with a locally-imposed regulation. You may consider this evidence in your deliberations. But remember that the issue is whether Defendant used excessive force on Plaintiff, not whether a regulation might have been complied with.").

qualifications to offer expert testimony in this case; any perceived shortcomings in those qualifications may be addressed in cross-examination. *Id.*

Plaintiffs also attack the reliability of Bauer's conclusions based on supposed gaps in his methodology. Bauer's opinions concern accident reconstruction and largely mirror Hyde's (and Scott's to a lesser extent). He relies on much of the same data and observations as Plaintiffs' experts, though his focus is aimed more at Malone's driving than Ewing's. Plaintiffs emphasize that Bauer did not conduct a site visit, instead relying on photographs and videos, maps, and virtual mock-ups of the intersection, which they claim render his opinions unreliable. But Courts in this district have rejected similar arguments that site visits are "required" elements of accident reconstruction analysis. *See, e.g.*, *Paine ex rel. Eilman v. Johnson*, 2010 WL 749857, at *2 (N.D. Ill. Feb. 25, 2010) (finding expert's accident reconstruction was appropriately founded on traffic collision report, photographs of the vehicle and accident site, and other mechanical and structural information); *Pike v. Premier Transp. & Warehousing, Inc.*, 2016 WL 6599940, at *5 (N.D. Ill. Nov. 8, 2016) (rejecting argument that expert's failure to inspect the scene of the accident rendered opinions unreliable and inadmissible). Any discrepancies between the circumstances in those cases and the situation at bar are tangential—the Court is satisfied that a site visit was not absolutely necessary and that Bauer's methodology rests on sufficient objective evidence to meet the bare foundational requirements for admissibility. To the extent his failure to visit the site around the time of the accident undermines the credibility of his opinions, Plaintiffs are free to cross-examine him on

it. *See Paine*, 2010 WL 749857, at *3 (finding that expert's failure to refer to specific pieces of evidence was a factor going to the weight of his conclusion, not its admissibility).

Plaintiffs then move line-by-line through Bauer's report and attack nearly every statement on one or more grounds. Many of these statements are simply Bauer's interpretation of the data, including Bauer's conclusions about Ewing's braking and steering immediately before the crash. Plaintiffs may disagree with these conclusions, but they are premised on the same data their own experts considered. This testimony will not be excluded—it is for the jury to decide which expert's conclusions best comport with the evidence. *See Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact.").

Other challenged statements constitute assumptions that underpin Bauer's conclusions. For example, Plaintiffs seek to exclude testimony from Bauer that civilian traffic would typically be slowing while approaching the 124th and Union intersection, and that the area around the intersection was generally free of pedestrians and other cars at the time of the crash. R. 230 ¶¶ 9-11. While Plaintiffs have pointed to evidence that may undermine these assumptions, this is not grounds to exclude the testimony. *See Stollings v. Ryobi Techs., Inc.*, 725 F.3d 753, 768 (7th Cir. 2013) ("The fact that an expert's testimony contains some vulnerable assumptions does not make the testimony irrelevant or inadmissible."). Once again,

17

cross-examination provides ample opportunity to test Bauer's opinions with conflicting evidence. *See id.*

However, some of Bauer's opinions must be excluded for the same reasons discussed in relation to Plaintiffs' experts. Bauer's opinion in paragraph 14 of his report that no driver would have expected to encounter traffic entering the 124th Street and Union Avenue intersection traveling the wrong way on Union Avenue is inadmissible as both an improper topic for expert testimony (because it is within the common knowledge of the jury) and irrelevant in light of the Court's conclusion as to Defendants' "unavoidable collision" defense. Likewise, to the extent Bauer opines that the crash would not have occurred had Malone acted differently, this is a factual conclusion within the understanding of an average person, and therefore is inadmissible as unhelpful to the jury.

## II. Defendants' Summary Judgment Motions

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests,

determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 2021 WL 4486445, at *1 (7th Cir. Oct. 1, 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

Where the parties have filed cross-motions for summary judgment, the Court applies this standard to each motion separately to determine whether there is a genuine dispute of material fact and whether judgment should be entered as a matter of law. *Marcatante v. City of Chicago*, 657 F.3d 433, 438-39 (7th Cir. 2011). In ruling on each cross-motion for summary judgment, the Court draws inferences in favor of the party against whom the motion under consideration is made. *Siliven v. Ind. Dep't of Child Servs.*, 635 F.3d 921, 925 (7th Cir. 2011).

### a. Defendants' Motion for Summary Judgment on Plaintiffs' Federal Claims

Plaintiffs' federal claims allege that Ewing violated their civil rights by unreasonably using excessive and deadly force to seize the vehicle they were riding in when he crashed his police vehicle into the Pontiac being driven by Malone. Defendants argue they are entitled to summary judgment on the federal claims because (1) Ewing's conduct did not constitute a "seizure" because it was not intentional, therefore the Fourth Amendment does not apply here; (2) even if Ewing acted intentionally, his actions were reasonable; and (3) Ewing is entitled to qualified immunity.

19

The Fourth Amendment applies only to "searches" or "seizures" by a state actor. *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998). A Fourth Amendment seizure occurs "only when there is a governmental termination of freedom of movement through *means intentionally applied*." *Brower v. Cty. of Inyo*, 489 U.S. 593, 596-97 (1989) (emphasis added). The Seventh Circuit has explained that the intent requirement differentiates an "accidental or tortious act which happens to be committed by a governmental official and an intentional detention that rises to the level of a constitutional violation." *Bublitz v. Cottey*, 327 F.3d 485, 489 (7th Cir. 2003) (quoting *Campbell v. White*, 916 F.2d 421, 422-23 (7th Cir. 1990)).

Defendants claim they are entitled to summary judgment because there is no evidence that Ewing intentionally drove his car into the Pontiac with the aim of ending its flight from police. They point to Ewing's testimony that he did not intend to collide with the Pontiac and evidence that Ewing could not have seen the Pontiac until one second before the crash and made an evasive steering maneuver immediately before impact.

This evidence, of course, is hotly disputed. Plaintiffs have offered expert testimony to discount Ewing's supposed evasive maneuver and suggest he in fact accelerated at the moment the Pontiac came into view. They also point to Ewing's driving in the lead-up to the crash, when he drove through controlled intersections at high speed in what he believed was a parallel direction to the pursuit, as indicative of his intent to forcibly bring the chase to an end.

20

Notwithstanding the evidentiary disputes, Defendants suggest this case is equivalent to *Campbell v. White*, 916 F.2d 421, 421 (7th Cir. 1990), and *County of Sacramento v. Lewis*, 523 U.S. 833 (1998). In *Campbell*, a police officer (White) was pursuing two speeding motorcyclists at night. *Id.* at 421. White lost sight of them temporarily, and one (Campbell) lost control of his motorcycle and ditched it in the median. *Id.* Campbell then walked back onto the highway. *Id.* As White passed another vehicle, he suddenly saw Campbell standing in the passing lane. *Id.* White tried to avoid Campbell but was unable—his car struck Campbell and killed him. *Id.* at 421-22. The court held that White was entitled to summary judgment because there was "no evidence whatsoever to suggest that White intended physically to stop or detain Campbell by running over him with his car in the event Campbell refused to pull over voluntarily." *Id.* at 423.

In *Lewis*, officers found themselves chasing a speeding motorcycle carrying two people. 523 U.S. at 836. Eventually the motorcycle crashed as it made a sharp left turn. *Id.* at 837. The pursuing officer slammed on his brakes but skidded into the passenger at 40 mph, killing him. *Id.* The Supreme Court held that the Fourth Amendment did not apply in this situation because the crash was accidental. *Id.* at 844.

Both *Campbell* and *Lewis* are distinguishable from the instant case on the critical fact that the pursuits at issue in those cases had concluded before the alleged seizure took place. Once the motorcycles crashed, the object of the officers' pursuits was achieved, and they had no reason or incentive to hit them with their vehicles.

21

Instead, this case resembles others involving collisions during active pursuits. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 381 (2007) (pursuing officer effected a Fourth Amendment seizure by ramming his bumper into the respondent's vehicle); *Hawkins v. City of Farmington*, 189 F.3d 695 (8th Cir. 1999). In *Hawkins*, police issued a generalized request for assistance in apprehending a fleeing motorcyclist. 189 F.3d at 698. A responding officer posted his squad car in the median of a highway and waited for the reported motorcycle. *Id.* Eventually a motorcycle appeared (though unknown to the officer and unfortunately for the driver, it was not the one involved in the chase). *Id.* at 698-699. The officer slowly moved his car into the road in the path of the motorcycle, and the two vehicles collided, resulting in numerous injuries to the motorcyclist. *Id.* at 699-700. The officer testified that while he intended to stop the motorcycle, he did not intend to ram it with his police car. *Id.* at 700. At the close of plaintiff's evidence, the trial court granted judgment as a matter of law to the defendant, finding that plaintiff had failed to establish that the officer seized him for purposes of a Fourth Amendment claim. *Id.*

The Eighth Circuit reversed the trial court's ruling on the Fourth Amendment claim, holding that whether a seizure occurred and whether it was reasonable were questions for the jury. *Id.* at 702. The court said that the evidence was sufficient for a jury to conclude that the officer intentionally terminated the motorcyclist's freedom of movement, notwithstanding the officer's testimony that the collision was unintentional. *Id.*

Like in *Hawkins*, the crash here took place during a live pursuit of which Ewing was at least minimally aware, meaning there was at least some reason why Ewing would have been motivated to forcibly stop the fleeing Pontiac. And like the officer in *Hawkins* staking out the highway, Ewing's following the radio callouts regarding the pursuit put him in a position to stop the chase by force. Taking the evidence in the light most favorable to the Plaintiffs, a reasonable jury could conclude Ewing's collision with the Pontiac was an intentional seizure meant to arrest the movement of the fleeing car and its occupants.

Defendants argue that even if the Fourth Amendment applies, the evidence shows that Ewing's actions were reasonable. While officers are sometimes entitled to use force to stop a vehicle chase that poses a danger to the community, *see, e.g.*, *Scott*, 550 U.S. at 383-84, the reasonableness of that decision is an objective inquiry that depends on the circumstances as they appeared to an officer at the time of the events, *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003). The Court finds summary judgment on this ground is precluded by disputed issues of fact. In particular, it is not clear from the record the extent to which Ewing was actively involved in the pursuit, nor what he knew about the offense the suspects had committed or the details of their flight from ISP troopers. A case like *Scott* might be a compelling guidepost in this case if troopers from the ISP had forcibly stopped the Pontiac during their pursuit, but its application to a separate police officer at least partly removed from the chase is more suspect. Without a clear picture of the situation as it appeared to Ewing, the Court cannot determine whether he violated the limits the Constitution placed on his

23

conduct. *See id.* at 640-41; *see also Donovan v. City of Milwaukee*, 17 F.3d 944, 951 (7th Cir. 1994) (discussing reasonableness of stopping fleeing driver with deadly force by reference to the driver's conduct and surrounding circumstances).

Finally, Defendants argue that Ewing is entitled to qualified immunity. Qualified immunity shields government officials performing discretionary functions from liability unless their conduct violates "clearly established statutory or constitutional rights." *Hernandez v. Sheahan*, 711 F.3d 816, 817 (7th Cir. 2013) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "In determining qualified immunity, the court asks two questions: (1) whether the facts, taken in the light most favorable to the plaintiff, make out a violation of a constitutional right and (2) whether than constitutional right was clearly established at the time of the alleged violation." *Id.* Demonstrating a "clearly established" constitutional right does not require binding precedent "on all fours" with the case at bar, but a plaintiff must point to "case law in a closely analogous area" that would have apprised a reasonable official of the relevant limits on his or her conduct. *Donovan*, 17 F.3d at 952.

As the Court described above, the evidence would allow a reasonable jury to find that Plaintiffs' constitutional rights were violated. Turning to the second prong, the Supreme Court has pronounced a general rule that police may not seize a fleeing, nondangerous suspect with deadly force. *See Tennessee v. Garner*, 471 U.S. 1, 11 (1985). That general rule is subject to an exception, however, permitting the use of deadly force when "the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others." *Id.* As noted, it is

24

not clear on the record what Ewing knew about the Pontiac's driving or the crime that precipitated ISP's pursuit. The rule has been well established, at least since *Garner*, that flight from police does not justify the use of deadly force by an officer unless the officer knows the suspect poses a serious risk to others. Because the record does not conclusively show that Ewing was aware of facts that would have triggered the exception, the Court cannot hold that he is entitled to qualified immunity at this time.

Accordingly, the Court finds that genuine issues of material fact exist as to Plaintiffs' § 1983 claims, and therefore denies Defendants' motion for summary judgment on those claims.

### b. Defendants' Motion for Summary Judgment on Plaintiffs' Negligence Claims

#### i. Illinois Tort Immunity Act

Defendants claim Ewing is immune from liability because he was executing and enforcing the law when he collided with the fleeing Pontiac. Under Illinois law, "[a] public employee is not liable for his act or omission in the execution or enforcement of any law unless such act or omission constitutes willful and wanton conduct." 745 ILCS 10/2-202. Illinois courts have held that police officers responding to calls of a crime in progress are "executing or enforcing the law" within the meaning of this section. *See, e.g., Morris v. City of Chicago*, 474 N.E.2d 1274, 1277-78 (Ill. App. Ct. 1985). However, "[t]he mere fact that a police officer acts on the speculation that she may be required to enforce or execute some, as yet, undetermined law is not enough to activate the immunity set forth in section 2-202." *Hudson*, 881 N.E.2d at

447. Whether an officer is engaged in the execution or enforcement of the law is a question of fact that must be determined in light of the circumstances involved. *Morris*, 474 N.E.2d at 1277.

The Court cannot say as a matter of law whether Ewing was "enforcing the law" at the time of the crash, such that he would be entitled to immunity. On the one hand, Ewing was indisputably following the pursuit via radio traffic and was intentionally driving in the direction he believed it was heading. On the other, Ewing did not activate his siren and said that his main intent was to make himself available to assist the outside agency if necessary. He was unequivocal in testifying that he did not intend to ram the fleeing car. These facts are collectively ambiguous and do not allow the Court to decide whether section 2-202 applies in the first place.

Furthermore, even assuming Ewing was enforcing the law at the time of the collision, whether his conduct was "willful and wanton" cannot be determined at this stage.[3] "The question of what constitutes willful and wanton conduct is generally reserved for the trier of fact." *Brown v. Chicago Park Dist.*, 581 N.E.2d 355, 358 (Ill. App. Ct. 1991). Both sides have pointed to conflicting evidence on this issue. It is clear that Ewing's driving in the lead-up to the crash exceeded what would normally be permitted by the traffic laws, and could potentially be considered dangerous. However, police are permitted to drive in this manner, within reason, when they are responding to crimes, and such conduct is not ordinarily considered willful and

---

[3] Plaintiffs have withdrawn any claims that City employees other than Ewing acted with willful or wanton negligence. R. 211, at 23.

wanton. *See, e.g.*, *Shuttlesworth v. City of Chicago*, 879 N.E.2d 969 (Ill. App. Ct. 2007) (finding that police did not engage in willful and wanton conduct by pursuing a fleeing driver at high speed without activating emergency sirens or notifying superiors of the chase in progress). Notably, each side's experts disagree on whether Ewing's conduct in relation to the pursuit violated general police practices and CPD regulations. Such violations, if substantiated, are relevant evidence to the question of whether an officer's conduct was willful and wanton. *See Hudson*, 881 N.E.2d at 456. The experts also disagree about what the EDR data from Ewing's car reveals about his driving in the moments preceding the crash. Because the willful and wanton determination turns on the credibility of these experts' conclusions along with surrounding circumstances that have not been conclusively established, summary judgment on Defendants' section 2-202 defense must be denied.

### ii. Relative Fault

Defendants next assert that Plaintiffs cannot recover in negligence because no reasonable jury could find they bore 50% or less of the relative fault for their injuries. Under Illinois law, if a plaintiff is more than 50% at fault for an accident, he may not recover even if the defendant in fact acted negligently. 735 ILCS 5/2-1116(c); *Knights v. United States*, 203 F. Supp. 3d 916, 927 (N.D. Ill. 2016). Of course, none of the Plaintiffs were behind the wheel of the Pontiac as it fled from pursuing ISP troopers, and the negligence of a driver ordinarily may not be imputed to his passenger. *Campanella v. Zajic*, 379 N.E.2d 866, 867 (Ill. App. Ct. 1978); *see also Seeger*, 607 N.E.2d at 691-92 ("These cases clearly demonstrate that Illinois has adopted the 'better rule' that an owner-passenger should only be liable for his own negligence,

27

such as where he knows of a danger and fails to take available precautions, and should not have that of the driver imputed to him."). Defendants argue that Malone's negligence is nonetheless chargeable to Plaintiffs as individuals engaged in a joint enterprise—namely, the robbery in the Arby's parking lot that precipitated the chase.

A joint enterprise "exists where driver and occupant are engaged in a journey which is part of a business enterprise in which the parties have a mutual interest." *Galliher v. Holloway*, 474 N.E.2d 797, 802 (Ill. App. Ct. 1985). Defendants argue the joint venture is established by the facts in the immediate aftermath of the crime: that Arrington allowed Malone to get back in the vehicle after the robbery, drove some distance back to the highway, and allowed Malone to take over driving the Pontiac, and that all Plaintiffs refused to get out of the vehicle when it stopped on the exit ramp for 20 seconds early in the pursuit. Stevenson and Cokes also later pled guilty to misdemeanors in connection with the theft.

These facts are largely circumstantial, however, and Plaintiffs point to testimony that they did not know exactly what Malone had done at the Arby's and that they repudiated his actions, even demanding that he stop and let them out. As to Arrington relinquishing control of the Pontiac to Malone, the evidence is susceptible to multiple interpretations—Arrington could fairly be said to have refused to act as a "getaway driver" but had no other choice but to stay in the car, as it was on the highway. It is also not clear to what extent evidence of Plaintiffs' convictions or roles in the crime would be admissible at trial (something best addressed via motions in limine). Moreover, cases finding a joint enterprise often cite

28

facts that one of the participants had a right to direct or control the other in the management of the car, which does not appear to be true here. *See Campanella*, 379 N.E.2d at 867 (citing *Fisher v. Johnson*, 238 Ill. App. 25 (1925)); *see also* Ill. Civil Pattern Jury Instruction 72.04 (requiring proof that participants in alleged joint enterprise shared a right to control in the operation of the car). The factfinder could reasonably conclude that here, Malone had exclusive control of the car and Plaintiffs were unwittingly and unwillingly along for the ride.

Likewise, the facts do not compel a finding that Plaintiffs negligently failed to control Malone's driving. It is not obvious on the record that Plaintiffs knew Malone was going to flee from police in reckless fashion, though there is evidence they knew him as a "getaway driver." Defendants contend that once the pursuit began, Plaintiffs had the opportunity to exit the vehicle when it stopped on the exit ramp (as the ISP troopers ordered) but failed to do so. This evidence must be weighed against evidence that Plaintiffs attempted to get out of the car later in the pursuit, which supports their view of the facts. The jury is the proper body to undertake such evidentiary weighing. Defendants' motion for summary judgment on their relative fault defense is denied.

### iii. Unavoidable Collision

Finally, Defendants claim Ewing was not negligent because he was on a "preferential road" and had the right-of-way, rendering the collision unavoidable once the Pontiac traveling the wrong way up Union Avenue entered his path. The unavoidable collision doctrine ordinarily applies "when a motorist is confronted with a sudden swerve into his right-of-way by an approaching vehicle. Thus, the driver has

insufficient time to react and take evasive action." *Guy v. Steurer*, 606 N.E.2d 852, 856 (Ill. App. Ct. 1992). In such cases, the actions of the defendant, though logically a "but for" cause of the crash, are said to be without proximate cause, and the defendant's own purported failure to observe a duty of care is immaterial. *Id.* Defendants premise their argument on the fact that the Pontiac was speeding up Union Avenue in the wrong direction when it entered the intersection and Ewing's path, akin to a driver suddenly and unexpectedly swerving into the path of an oncoming car.

The Court finds this case too far removed from ordinary "unavoidable collision" cases for the rule to apply here. Critically, defendants' opening premise—that Ewing was on a preferential road with the right-of-way—does not align with Illinois cases considering the term. When Illinois courts use the term "preferential highway," they typically "refer to an intersection where the preferential highway is a through highway with no stop signs and the other 'non-preferential' highway or secondary road is controlled by a stop sign. *Albert v. Guererro*, 2018 WL 1462291, at *4 (Ill. App. Ct. Mar. 22, 2018) (citing cases). Ewing was not on such a highway, but had a stop sign controlling his approach to the intersection, a stop sign he disregarded.

Defendants claim Ewing was nonetheless on the preferential road because he was operating an emergency vehicle engaged in law enforcement, which entitled him to disregard (to a degree) traffic controls. First, as discussed above, that Ewing was engaged in law enforcement is not a foregone conclusion. But even assuming he was, the Court finds no support among Illinois cases for the idea that a non-preferential

road is transformed into a preferential road by virtue of the circumstances of the person driving on it. *Cf. id.* (concluding that a road normally controlled by a stop sign does not become a preferential road if the stop sign is downed or missing (citing *Voyles v. Sanford*, 539 N.E.2d 801 (Ill. App. Ct. 1989))). Rather, the defendant's operating on a preferential roadway seems to be an objective fact to be established at the outset. *See Coole v. Cent. Area Recycling*, 893 N.E.2d 303, 310 (Ill. App. Ct. 2008) ("Courts have recognized an 'unavoidable collision.' In such cases the driver on the preferential road is without proximate cause, and the driver's acts or omissions in breach of a duty are not material."); *Moore v. Swoboda*, 571 N.E.2d 1056, 1065 (Ill. App. Ct. 1991) (citing the usual rule that "the driver on the preferential highway has no duty to expect that a driver on a nonpreferential highway will disobey a stop sign and collide with his vehicle").

This conclusion is bolstered by the qualified nature of the unavoidable collision doctrine, which is not a free pass to "plunge blindly ahead in reliance on the assumption that the other motorist will obey the law and yield the right of way." *Id.* at 857. Instead, "the preferential driver 'has a duty to keep a proper lookout, observe due care in approaching and crossing intersections, and drive as a prudent person would to avoid a collision when danger is discovered or, by the exercise of reasonable care, should have been discovered.'" *Powell v. Dean Foods Co.*, 7 N.E.3d 675, 695 (Ill. App. Ct. 2013). Furthermore, under the applicable statute, officers relying on their emergency authority to exceed speed limits or ignore stop signs retain some responsibility to ensure they do not place others at risk in doing so. 625 ILCS 5/11-

205. For these reasons, the Court denies Defendants' motion for summary judgment on this ground, and will grant Plaintiffs' motion for partial summary judgment as to the unavoidable collision defense.

The Court's ruling on this issue does not mean evidence that Ewing was not the proximate cause of the crash is inadmissible. However, the unavoidable collision rule will not be grounds to exclude any evidence of Ewing's own conduct or argument that he breached an applicable duty. The Court leaves it to the parties to craft appropriate motions in limine and instructions in light of this conclusion.

### c. Defendants' Motion for Summary Judgment on Plaintiffs' Battery Claims

In Illinois, battery is an intentional tort with three elements: (1) an intentional act by the defendant (2) that results in offensive contact with the plaintiff (3) without the plaintiff's consent. *Obermeier v. Nw. Mem'l Hosp.*, 134 N.E.3d 316, 333-34 (Ill. App. Ct. 2019); *see also Wagner v. Cook Cty. Sheriff's Office*, 453 F. Supp. 3d 1101, 1102 ("To prove battery, plaintiff must show that [the defendant] 'intended to cause a harmful contact, that harmful contact resulted and that the plaintiff did not consent." (quoting *Happel v. Wal-Mart Stores, Inc.*, 319 F. Supp. 2d 883, 885 (N.D. Ill. 2004))).[4] Defendants' motion as to the battery claims is premised entirely on their

---

[4] Note that while battery requires proof the defendant intended to cause contact with the plaintiff, courts in Illinois have held that the defendant's intent to harm or offend the plaintiff is irrelevant. *See, e.g., Pechan v. DynaPro, Inc.*, 622 N.E.2d 108, 117 (Ill. App. Ct. 1993 ("An action for battery does not depend on the hostile intent of the defendant, but on the absence of the plaintiff's consent to the contact."); *accord Wagner*, 453 F. Supp. 3d at 1103 (citing rule that the defendant's lack of hostile intent is immaterial in battery claim).

argument that the collision was an accident, necessarily defeating the "intent" element. *See Bakes v. St. Alexius Med. Ctr.*, 955 N.E.2d 78, 86 (Ill. App. Ct. 2011) (explaining that the intent element of battery requires at least "some affirmative act intended to cause the unpermitted contact").

As discussed above, whether Ewing intended to crash his vehicle into the Pontiac is a disputed question of fact. Defendants rely principally on Ewing's own testimony that the crash was an accident, but a jury could reasonably reject this testimony in light of other evidence that he acted intentionally at least up until the moments before the crash. *See Harper v. Bob Rohrman Pre-Owned Car Superstore*, 2019 WL 1281987, at *7 (N.D. Ill. Mar. 20, 2019) ("Questions about which witnesses to believe and how much, if any, of their testimony should be credited belong to the jury."). This question of fact precludes summary judgment on the battery claims.

### d. Defendants' Motion for Summary Judgment on Plaintiffs' Indemnification and *Respondeat Superior* Claims

Defendants' motion as to Plaintiffs' vicarious liability claims may be rejected on similar reasoning: it is premised entirely on the ground that Plaintiffs cannot prove any underlying liability as to Ewing. Because the Court has already found that disputed issues of fact preclude summary judgment as to the substantive claims against Ewing, this derivative argument must also be denied at this juncture.

## III. Plaintiffs' Summary Judgment Motions

### a. Plaintiffs' Motion for Summary Judgment on their Federal Claims, Negligence Claims, and Battery Claims

Given the discussion above, the Court can make short work of much of Plaintiffs' motion. Just as disputed facts preclude summary judgment on most of the

issues raised in Defendants' motions, Plaintiffs' evidence is not so conclusive that "the outcome of a trial would be a foregone conclusion." *Backes v. Valspar Corp.*, 783 F.2d 77, 79 (7th Cir. 1986). At minimum, as it relates to the Fourth Amendment excessive force claim, the question of whether Ewing intentionally seized the Pontiac by crashing into it with his car is a contested issue. Plaintiffs make hay of the fact that Defendants are relying on "self-serving" testimony from Ewing that the crash was accidental, but of course every party's evidence tends to be self-serving—that does not mean it is automatically meritless or beyond consideration. *See Whitlock v. Brown*, 596 F.3d 406, 411 (7th Cir. 2010) (explaining that self-serving deposition testimony may be sufficient to carry an evidentiary burden at summary judgment); *Davenport v. Potter*, 2008 WL 4126603, at *3 (N.D. Ill. Aug. 15, 2008). And it is not merely Ewing's own testimony that supports Defendants' position—both sides have spared no expense mustering extensive expert testimony on this very issue. For instance, Defendants' expert cites to objective evidence from the Ford's EDR that supposedly shows braking and an evasive maneuver less than a second before the crash.

The same holds true for Plaintiffs' negligence and battery claims. The latter turns on the disputed fact issue of whether the collision was an intentional act by Ewing. As to the negligence claims, Plaintiffs' arguments all rely on a contested interpretation of Ewing's conduct as willful and wanton, a determination best left to the jury. *Brown*, 581 N.E.2d at 358. The notion that either side is obviously correct on any of these claims and that the Court should take the case from the jury at this

34

stage is untenable. While the jury may ultimately side with Plaintiffs, Defendants have met their burden to resist summary judgment on these claims.

### b. Plaintiffs' Motion for Partial Summary Judgment on Defendants' Affirmative Defenses

#### i. Section 2-201 Immunity

Among their defenses, Defendants invoke the civil immunity provision in 745 ILCS 10/2-201, which states that "a public employee serving in a position involving the determination of policy or the exercise of discretion is not liable for an injury resulting from his act or omission in determining policy when acting in the exercise of such discretion even though abused." The Illinois Supreme Court has held that section 2-201 immunity is available only if the public official's act is "both a determination of policy and an exercise of discretion." *Torres v. City of Hardin Cty. Cmty. Unit Sch. Dist. No. 1*, 758 N.E.2d 848, 852 (Ill. 2001).

While Ewing's actions here were arguably an exercise of discretion, they were not a determination of policy. Other courts have rejected the application of section 2-201 to comparable claims arising from law enforcement actions, even when those acts involve some degree of judgment by individual officers. *See, e.g.*, *Brown v. Village of Evergreen Park*, 2002 WL 31844991, at *4 (N.D. Ill. Dec. 18, 2002) (holding section 2-201 immunity did not apply in false arrest and false imprisonment claims against police officers because "although the officers were arguably exercising discretion in their actions, certainly they were not formulating policy"); *Redwood v. Ferry*, 2006 WL 8445016, at *4 (C.D. Ill. May 18, 2006) (holding section 2-201 inapplicable to

claims that police, among other offenses, conducted an unlawful search and seizure in violation of the Fourth Amendment because officers were not formulating policy).

Defendants do not respond to Plaintiffs' motion on this issue in substance, instead suggesting the Court should resolve it via motions in limine or jury instructions. The Court sees no reason to delay what is a straightforward ruling: section 2-201 does not apply to Ewing's actions in this case. Plaintiffs are entitled to summary judgment on this defense.

ii. <u>Section 2-204 Immunity</u>

Section 2-204 provides that "[e]xcept as otherwise provided by statute, a public employee, as such and acting within the scope of his employment, is not liable for an injury caused by the act or omission of another person." 745 ILCS 10/2-204. Defendants contend Ewing should be allowed to assert section 2-204 immunity because "multiple people other than Officer Ewing are the proximate cause of the injuries alleged here." R. 217, at 19. This section is inapplicable here, however, because Plaintiffs assert claims directly against Ewing, and the provision does not abrogate *respondeat superior* liability against Ewing's employer.[5] *See Awalt v. Marketti*, 74 F. Supp. 3d 909, 943 (N.D. Ill. 2014). Plaintiffs are therefore entitled to summary judgment on this defense. This of course does not mean Defendants are barred from offering evidence that persons other than Ewing were the cause of

---

[5] Indeed, in their reply brief, Plaintiffs concede that they are not seeking to hold Ewing responsible for any other person's acts. R. 224, at 20.

36

Plaintiffs' injuries, evidence which would negate the causation elements of Plaintiffs' various claims.

### iii. Section 2-202 Immunity

The Court addressed the application of section 2-202 in its discussion of Defendants' motion for summary judgment. *See* discussion *supra*. Unlike section 2-201, section 2-202 is potentially applicable to Ewing's conduct in this case. However, for much the same reasons the Court rejected Defendants' motion as to this provision, the Court must reject Plaintiffs' countervailing position. Whether Ewing was executing the law at the time of the collision, and whether his conduct was willful and wanton, are disputed questions of fact on the record. The Court therefore denies Plaintiffs' motion for partial summary judgment as to Ewing's potential section 2-202 immunity.

### iv. Failure to Mitigate Damages

"[T]he rule of mitigation of damages involves imposing a duty upon the injured party to exercise reasonable diligence and ordinary care in attempting to minimize his damages *after* injury has been inflicted." *Brady v. McNamara*, 724 N.E.2d 949, 953 (Ill. App. Ct. 1999). Plaintiffs argue Defendants should be barred from asserting a failure to mitigate damages because (1) Arrington died on the date of the crash and was legally incapable of mitigating any damages; and (2) Stevenson and Cokes were immediately taken into custody and remained imprisoned through the treatment of their injuries. Defendants respond that each of Stevenson, Cokes, and Arrington's representative Juanita Arrington testified that they continue to experience lasting

mental and physical damages, but either stopped seeking or do not consistently seek medical treatment.

Plaintiffs assert that Defendants' argument as to Juanita Arrington's damages is untimely, and in any event concede that she has no damages claim in this case for her own mental, emotional, or physical injuries, which they claim renders Defendants' argument irrelevant. R. 224, at 25; R. 224-1 ¶¶ 89-92. However, Defendants have pointed to evidence which could reasonably support a defense for failure to mitigate damages as to Stevenson and Cokes stemming from their failure to exercise diligence in seeking medical care once they were no longer in custody. It also does not appear Defendants are making any argument that *Ronald* Arrington failed to mitigate damages.

Lacking a clear view of the evidence as it relates to the actual damages claims at issue, the Court will deny the motion for partial summary judgment without prejudice to raising these issues again. The parties should also consider appropriate motions in limine and instructions based on the actual damages claims at issue, which can be resolved closer to trial.

v. Unavoidable Collision

As discussed above, the Court will grant Plaintiffs' motion for partial summary judgment as to the affirmative defense of unavoidable collision. *See* discussion *supra*.

vi. Joint Enterprise

Plaintiffs seek partial summary judgment on Defendants' claim that any negligence of Malone as the driver of the Pontiac is imputable to them as members of a joint enterprise. As with Defendants' motion on the same issue, disputed issues of

fact preclude summary judgment here. Taking the evidence in the light most favorable to Defendants, a reasonable jury could conclude that even if the original aim of the car trip was not to facilitate a robbery, the conduct of everyone in the car demonstrated that the flight from police was a mutual endeavor. There is evidence that at least Cokes saw Malone's altercation with the victim in the Arby's parking lot, which undermines the conclusion that the passengers had no idea what had transpired. Although Malone was the one behind the wheel during the pursuit, the other occupants did not exit the vehicle when it stopped on the highway exit ramp, despite instructions from ISP to do so, and evidence suggests they knew him as a "getaway driver." Stevenson and Cokes also pleaded guilty to misdemeanor theft in connection with the crime. These facts are sufficient to allow the issue to proceed to trial.

vii.  Failure to Control Driver or Take Precautions

Passengers in a vehicle have a duty to control a driver only if they know or should know that such actions are essential to their safety. *Bauer v. Johnson*, 403 N.E.2d 237, 241 (Ill. 1980). However, passengers may also be found negligent if they know of the danger associated with riding in a vehicle but fail to take available precautions. *Seeger*, 607 N.E.2d at 691; *see also Rice v. Merchants Nat'l Bank*, 572 N.E.2d 439, 447 (Ill. App. Ct. 1991) (finding sufficient evidence to support contributory negligence finding where plaintiff-passenger got into car despite knowing driver had been drinking beforehand). Plaintiffs claim they had no relevant knowledge that would have led them to believe Malone would endanger them by fleeing from police before the chase began, and that once the pursuit was underway,

39

any efforts by them to take control of the vehicle would have been ineffective or even dangerous.

The latter point is well taken, but as discussed above, it does not appear Defendants are suggesting Plaintiffs should have forcibly seized control of the Pontiac from Malone in the throes of the police pursuit. And as to the former, the Court cannot conclude as a matter of law that Plaintiffs had no notice of the danger facing them, nor the ability to avoid that danger through readily available actions. The evidence permits a reasonable conclusion that Plaintiffs had some sense of trouble stemming from what happened in the Arby's parking lot, and Arrington in particular had total command of the Pontiac up until he willingly relinquished control to Malone. Plaintiffs' alleged protestations, including Arrington's eventual refusal to drive, is evidence that they knew something nefarious had occurred (though it also arguably supports the view that they wanted no part of it). A jury could also conclude that Plaintiffs had ample opportunity to exit the vehicle on the highway when ISP originally stopped them. Although at this point Malone had apparently not been actively evading police, each Plaintiff nonetheless disobeyed lawful commands from law enforcement by staying in the car.

Plaintiffs seek to distinguish a case like *Rice* on its facts, contending that this case does not involve something as obviously hazardous as an intoxicated driver. R. 224, at 45-46. But this is simply a quibble with the factual determination of whether Plaintiffs knew or should have known their safety was at risk with Malone behind the wheel. Setting aside that disparity (drunk driver versus possible fugitive driver),

*Rice* actually seems reasonably analogous. There the court relied on the fact that the plaintiff at least had some notice of danger and had a later opportunity to exit the vehicle. *Rice*, 572 N.E.2d at 447. The court affirmed the jury's verdict despite the fact that "there was no evidence of erratic driving before the accident." *Id.* This indicates that a contributory negligence finding against the vehicle passengers can be supported by the circumstances even before the immediate risk manifested. Accordingly, the Court finds that Plaintiffs' contributory negligence remains an available defense and denies their motion for partial summary judgment on this issue.

## Conclusion

For the foregoing reasons, the Court resolves the instant motions as follows: Defendants' motion for summary judgment is denied. [R. 201 (Case no. 17-cv-5345); R. 278 (Case no. 17-cv-4839).] Plaintiffs' motion for summary judgment is granted in part and denied in part. [R. 199 (Case no. 17-cv-5345); R. 276 (Case no. 17-cv-4839).] Defendants' motion to bar certain expert opinions is granted in part and denied in part. [R. 220 (Case no. 17-cv-5345); R. 299 (Case no. 17-cv-4839).] Plaintiffs' motion to bar expert opinions is granted in part and denied in part. R. 230 (Case no. 17-cv-5345); R. 309 (Case no. 17-cv-4839).]

ENTERED:

Honorable Thomas M. Durkin
United States District Judge

Dated: June 10, 2022